UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X
JASON WALKER,

                 Petitioner,    07 Civ. 2540 (RMB)(DFE)

     - against –         <u>REPORT AND RECOMMENDATION</u>
                             <u>TO JUDGE BERMAN</u>
H.D. GRAHAM, Superintendent,

                 Respondent.
-------------------------------X

DOUGLAS F. EATON, United States Magistrate Judge.

     The *pro se* habeas corpus petition of Jason Walker challenges
his conviction after a 2002 suppression hearing and a 2003 trial,
both held before Justice Edwin Torres in Supreme Court, New York
County.  Walker did not testify at the suppression hearing, but
he did testify at his trial.  The jury found that he was guilty
of the following crimes by acting in concert with Bernard Perez
and Rahman ("Roc") Williams in the gruesome killing of Jerry
("Moustafa") Pollard - - two counts of Murder in the Second
Degree (intentional acting-in-concert murder, and also felony
murder), two counts of Burglary in the First Degree, two counts
of Robbery in the First Degree, and one count of Robbery in the
Second Degree.  Walker was a predicate violent felon.  Justice
Torres imposed concurrent sentences of 25 years to life in prison
on the counts of murder, burglary and first-degree robbery.

     Perez and Williams were each indicted for Murder in the
First Degree (unlike Walker).  On September 18, 2002, Williams
pleaded guilty to that top charge and was sentenced to 25 years
to life.  Perez, indicted separately, was found guilty in 2004
and sentenced to life without parole.  (Answer, Exh. A at p. 3.)

     Walker was represented by Eric M. Sears at the suppression
hearing, trial and sentencing.  On appeal, Walker was represented
by Jonathan M. Kirshbaum of the Center for Appellate Litigation.
The Appellate Division unanimously affirmed the conviction.
*People v. Walker*, 25 A.D.3d 504, 808 N.Y.S.2d 223 (1st Dept.
2006).  On February 28, 2006, Chief Judge Kaye denied leave to
appeal to the New York Court of Appeals.  6 N.Y.3d 819, 812
N.Y.S.2d 459 (Ct. App. 2006).

     Walker mailed a timely habeas petition to our Court; our Pro
Se Office received it on February 22, 2007.  At the end of his

petition, Walker asked our Court to stay this habeas proceeding so that he might "exhaust state remedies."  In a Memorandum and Order dated June 6, 2007, I quoted from *Rhines v. Weber*, 125 S.Ct. 1528, 1535 (2005), and I directed Walker to send me "a detailed description of any new claims and an explanation for the delay."  Walker responded with a two-page letter postmarked July 2, 2007, stating:

> Petitioner seeks to file a State motion Pursuant to Criminal Procedure Law § 440.10(1)(h), and raise the following claims of ineffective assistance of trial counsel for his failure to (1) move to dismiss the indictment upon the [basis?] of CPL §190.50; (2) failure to call codefendant as a witness; (3) failure to request a missing witness charge; (4) failure to object to the People's admiss[ibl]e evidence of uncharged crimes; and (5) failure to move to dismiss indictment upon Prosecutor Misconduct.

> Petitioner also, seeks to raise a S[]tate Writ of Coram Nobis upon Appellate Counsel for his failure to raise (1) trial cou[n]selor provided ineffective assistance at trial; (2) failure to have the full trial record to perfect the appeal.

In a Memorandum and Order dated July 11, 2007, I wrote: "Mr. Walker has failed to provide 'a detailed description of any new claims' and he has failed to provide 'an explanation for the delay.'  He gives no factual details to support any of his proposed claims.  In short, he has still not met the *Rhines* criteria for a stay.  Accordingly, I deny his request to stay this habeas proceeding."

On December 3, 2007, Assistant District Attorney ("ADA") Nicole Beder served (a) a 32-page Memorandum of Law, and (b) an Answer annexing the appellate briefs (Exhs. A, B and C).

I directed Walker to file any Reply on or before January 31, 2008.  He has not filed any Reply; therefore, I will read his terse petition in light of Exh. A (the 58-page brief written on his behalf by Mr. Kirshbaum to the Appellate Division).

On July 9, 2008, the District Attorney's Office filed the transcripts of the hearing, trial, and sentencing.

I shall now quote the habeas petition's entire statement of its two grounds:

-2-

> Ground One:  Violation of U.S. IV, XIV, N.Y. Art. I §§6, 12.
> Supporting facts:  Suppression of statements and
> identification since office[rs] had no probable cause.

I read this to incorporate Mr. Kirshbaum's Point I:  "Appellant's
statements and the identification should have been suppressed as
fruit of an unlawful arrest since the People failed to establish
that the arresting officers had probable cause for the arrest.
U.S. Const., Amend. IV, XIV; N.Y. Const., Art. I §§6, 12; C.P.L.
§140.10."  (Exh. B at pp. 31-39.)

> Ground Two:  Confrontation of non-testifying witness, U.S.
> XIV.  Supporting facts:  Violated rights to confront non-
> testifying witness of co-defendant.

I read this to incorporate Mr. Kirshbaum's Point II(B):
"Appellant was deprived on a fair trial based on Court rulings
that ... (B) allowed the People to elicit testimony that a non-
testifying co-defendant implicated appellant .... U.S. Const.,
Amend. XIV; N.Y. Const., Art. I, §6."  (Exh. B at pp. 39, 45-49.)

For the reasons stated below, I recommend that Judge Berman
deny Walker's petition.

### FACTUAL AND PROCEDURAL BACKGROUND

(I shall refer to the transcript of the suppression hearing
as "H.", the transcript of the suppression-motion argument and
decision as "D.", and the trial transcript as "Tr.")

### The suppression hearing

On September 23, 2002, the prosecutor produced testimony
from Detective Michael Davis (H. 3-49) and Detective Gennaro
Giorgio (H. 49-67).  On October 10, 2002, Justice Torres heard
oral arguments (D. 1-6) and stated his decision (D. 6-11).  He
decided that the police had ample probable cause to arrest
Walker, that Walker was accorded his *Miranda* warnings and agreed
to talk to the detectives, that Walker's statements were "devoid
of any semblance of suggestiveness, coercion, [or] duress," and
that the detectives conducted a fair line-up in which Walker was
identified by Fernando Castro.

### The trial

After jury selection (Voir Dire Tr. 1-214), the trial
commenced on November 3, 2003.

-3-

**Fernando Castro** testified at Tr. 130-70 as shown in the next four paragraphs:

1.  He and Bernard Perez had grown up together.  (Tr. 134.)  A couple of months before May 29, 2001, Castro met petitioner Walker, knew him as "Boogs," knew him "[n]ot that well, but we hung out."  (Tr. 147.)

2.  Several months before May 2001, Perez confided to Castro that he (Perez) had killed Doris Drakeford and had taken over her apartment, Apartment 7G in the Dyckman Houses.  (Cross-exam. of Castro: Tr. 154-57.)  (At Tr. 47-49, 55-56, the building manager testified that around May 16, he told Perez to vacate Apartment 7G but did not take the keys from Perez; some days later, he learned that police had recovered the body of the long-missing Ms. Drakeford.)  (At Tr. 251-62, Detective Leonard Golino testified that he went to Apartment 7G on May 24, 2001, smelled bleach, and saw a mop and sponges on a wet floor; Walker entered the apartment - - "He said that he had just stepped out[,] that he was mopping up and cleaning up because Bernard had to told him to clean up the apartment."  Detective Golino arrested Walker for trespassing, but the on-line booking arrest work sheet states "Subsequently, the defendant was found to be innocent [and the] arrest [was] voided."  At Tr. 257 the judge told the jury: "Folks, it would appear that the death of Doris Drakeford was four months prior to the events depicted by this officer.  I reiterate my instructions ... that the defendant is not charged with the death of or responsibility for the death of Doris Drakeford.")

3.  A few days before May 26, 2001, Perez confided to Castro that he (Perez) had been thrown out of Apartment 7G, needed a new apartment, and intended to kill Jerry Pollard, who lived in Apartment 9G.  (Tr. 164-69.)

4.  On May 27, around 4:00 p.m., Castro saw Perez in front of the building.  Perez had a plastic bag containing a saw, and told Castro "about some things that he had done in 9G."  (Tr. 138-39, 156, 165.)  Castro accompanied Perez to Apartment 9G and saw Williams and Walker watching television.  Perez led Castro into the bathroom, and Walker followed.  In the bathtub, Castro saw the body of a headless man with no hands.  Castro soon left and got drunk.  (Tr. 138-43.)  About six hours later, Castro approached police officers and told them what he had seen.  (Tr. 143-46.)

On May 28, around 1:00 a.m., a group of officers went to Apartment 9-G, arrested Perez and Williams, and recovered the

-4-

remains of Jerry Pollard.  (Foster: Tr. 70-90.)  The autopsy
doctor testified that the cause of death was strangulation by
ligature.  (Flomenbaum: Tr. 225-31.)

   **Detective Davis** testified to the jury at Tr. 341-411.  In
the early hours of May 28, he received information from Castro;
later, Perez and Williams made post-arrest statements to him
regarding the murder of Jerry Pollard.  (Tr. 342-46.)  Detective
Davis then began attempting to locate a young black man with a
scar on his face and the nickname "Bugs."  He obtained the
investigative file on the homicide of Doris Drakeford, saw the
voided May 24 arrest of Walker, and learned Walker's address in
Brooklyn.  (Tr. 346-49.)

   On May 29, 2001, around 5:30 a.m., Walker was arrested at
his residence in Brooklyn.  (Tr. 121.)  At about 8:00 a.m.,
Walker was brought to the 34th Precinct, and given breakfast.
At 10:45 a.m., Detective Davis read written *Miranda* warnings that
were signed by Walker.  (Tr. 352-54.)  After the first
interrogation, Walker signed a detailed written statement of
innocence; it was read to the jury at Tr. 358-64:  He said that
his May 24 arrest in Apartment 7G was voided and he was released
from a Bronx station house at 7:20 a.m. on May 25, that he went
directly home to Brooklyn and did not leave Brooklyn until his
May 29 arrest.  On Monday May 28, he watched a TV news report
that the police (a) found body parts in the Dyckman Houses in
Manhattan and (b) arrested Bernard Perez and Rahman Williams.

   At 3:15 p.m., Walker was placed in a lineup and was
identified by Castro as being present in Apartment 9G's bathroom
with the headless body.  Detective Davis told Walker that he had
just been identified by a witness who put him at the scene, and
that the detectives did not believe his statement of innocence.
Walker said it was the truth.  (Tr. 365-68.)

   Davis asked Detective Gennaro Giorgio to become involved in
the case.  Davis and Giorgio and third detective met with Walker
and played for him most of the videotape of Williams's statement.
(Tr. 368-72.)  Giorgio then resorted to a sort of game, in which
he proved to Walker that Giorgio knew what brand of vodka had
been in Apartment 9-G.  This provoked a loud, nervous reaction
from Walker.  (Tr. 373-74.)  They told him that they were going
to dust items in that apartment for fingerprints.  Then Walker
"stated that he wanted to tell us about the plan."  After further
conversations, Walker "started telling us about the plan of
killing the victim, how the other two guys were going to kill him
[Pollard] and everything[,] and he kind of left himself out of
that[,] still."  (Tr. 374-75.)  It took about a half hour "before

he admitted everything" that was in his second statement, written down by Davis.  (Tr. 375.)

Davis read Walker's second statement to the jury at Tr. 377-82.  It included the following:

"On Friday, May 25, 2001, subject[,] Bernard and Rockman [phonetic] were outside at the project, Tenth Avenue, about 1:30 P.M.

"Bernard had the idea to kill Moustafa and to take his apartment.  The idea was to catch him in the elevator and put him to sleep to choke him, while the subject hit him.

"Subject states he ... left around 1:00 A.M. or 2:00 A.M. and went home to Brooklyn.

"On Saturday, subject ... got to the projects around 5:00 P.M., saw Bernard and Rockman ....

\*       \*       \*

"... All four get into the elevator.  Bernard tells Moustafa to press the button and when Moustafa does that, Bernard grabs him from behind and begins to choke him.  Rockman starts to punch Moustafa and subject digs through Moustafa's pockets.

"Subject and others exit the elevator on the ninth floor.  Subject takes keys from Moustafa's pocket, subject opens door, Rockman is holding the elevator door open.  Bernard brings Moustafa into the apartment.

"Bernard takes Moustafa to the bedroom; subject stays in the living room.  Subject hit him in the elevator one time in the chest before taking the keys.

"Subject hears thumping; he goes to see what it is and subject sees Rockman beating Moustafa with a base-ball bat, hitting him on the back with a baseball bat.

"Bernard asked subject to pull a string that was around Moustafa's neck.  Subject says he couldn't do it.  He hears Moustafa's windpipe crack.  Subject goes back into the living room.

                    *     *     *

        "All three went downstairs.  Bernard was trying
to figure out where he could get something to finish
cutting off the head.  It was approximately 11:00 P.M.
at this time.  All three stayed downstairs looking for
some weed.

        "Subject goes home, gets home around 3:00 A.M.
Sunday and goes to sleep, wakes up about 12:15, 12:30
and takes the train again to Tenth Avenue in
Manhattan.

        "He sees Rockman and Bernard on the benches again
and it's about 2:00 P.M.  They walk along Dyckman,
crossed over, came back on the opposite side of
Dyckman Street, Bernard says to wait.  He [Bernard]
goes to the store and he buys a saw.

                    *     *     *

        "... Subject left about 2:00 A.M.  This is
Monday.  He takes the train home.

                    *     *     *

        "Subject stays in all day Monday.  Subject did
not want to leave his residence because he thought
the police were outside and he would be arrested.
He also stated that he took a sip of Giorgi Vodka
Saturday night upstairs in the apartment."

     Annexed to that written statement were drawings made by
Walker, depicting the saw and the location of the store where
Bernard had purchased the saw.  (Tr. 383.)

     After this, Walker gave a videotaped statement starting at
6:52 p.m. on Tuesday, May 29, 2001. (Tr. 383-85, 394.)  It was
played to the jury at Tr. 389.

     After the testimony of Detective Davis, the jury heard only
two more witnesses, namely Detective Giorgio and the defendant
Walker.  I will discuss their testimony later, in my discussion
of Ground Two.

     Justice Torres instructed the jury at Tr. 678-727.  The
instructions at Tr. 695-702 concerned the statements alleged to
have been made by the defendant; these instructions included:

                              -7-

... [T]he burden of proof is upon the People, the prosecution, to convince you, beyond a reasonable doubt, that the statement ascribed to the accused was voluntarily made and also that the statement was truthful.

       \*   \*   \*

"A confession, admission or other statement is involuntarily made by a defendant when it is obtained from him ... (b), by a public servant engaged in law enforcement activity or by a person acting under his direction or in cooperation with him, (1) by means of any promise or statement of fact which promise or statement creates a substantial risk that the defendant might falsely incriminate himself, or ...."

       \*   \*   \*

If you find that the statement was involuntarily made, then you must disregard it whether or not it was truthful. ....

(Tr. 695, 697-98, 700.)

The jury found Walker guilty of intentional acting-in-concert murder, and therefore (as instructed at Tr. 702) did not consider the theory of depraved-indifference murder. As mentioned at the outset of today's Report, the jury also found Walker guilty of felony murder, two counts of Burglary in the First Degree, two counts of Robbery in the First Degree, and one count of Robbery in the Second Degree. (Tr. 748.)

<u>DISCUSSION OF WALKER'S HABEAS PETITION</u>

**Ground One**: The claim that the prosecution failed to prove that the arresting officers had probable cause to arrest Walker.

After the careful instructions quoted above, the jury presumably found that the prosecution had proven the voluntariness of the confession embodied in Walker's second written statement and in his videotape. (I have not seen the videotape, but it appears to be undisputed that the videotaped statement was essentially the same as the second written statement.) To put it mildly, the confession was amply

-8-

corroborated by the testimony of the main civilian witness Fernando Castro.  Walker's appellate attorney argued that the statements should have been suppressed on the ground that the People "failed to meet their burden at the suppression hearing to establish probable cause for the arrest."  (Exh. A at p. 31.)

This argument rested on two assertions.  The first assertion was that at the hearing Detective Davis "testified that the codefendants had <u>only</u> stated that appellant was present" at the homicide.  (Exh. A at p. 34, emphasis in the original, referring to H. 5.)  The People's brief to the Appellate Division (Exh. B at pp. 37-47) responded as follows.  During the 28 hours between the arrest of Williams and the arrest of Walker, Williams had confessed and had stated that Walker (whom he apparently knew as "Bugs," see H. 5) was not only present, but that Walker had helped Perez strangle Pollard with a yellow rope.  Williams's written statement was annexed to the 7/24/01 omnibus motion for Walker, even though it was not formally placed in evidence at the 9/23/02 hearing.  (Exh. B at p. 38 n.22.)  The videotape version of Williams's statement was viewed by Justice Torres between the 9/23/02 hearing and the 10/10/02 oral argument.  (D. 4.)

The second assertion was that "the People presented no testimony at the suppression hearing that established - - even circumstantially - - that the alleged probable cause was actually communicated to and received by the detaining officers prior to appellant's detention."  (Exh. A at p. 37.)  The People's brief responded as follows (Exh. B at p. 44):  "[T]here was no reason for Detective Whitehead to go to Brooklyn and arrest defendant unless one of the many detectives who were assisting Davis with the case had instructed him [Whitehead] to do so.  And, there was solid circumstantial evidence to support the trial court's finding that the information about defendant that Perez and Williams gave in their statements 'was provided to the [arresting] officers' [quoting D. 7]."

The Appellate Division affirmed the finding of probable cause as follows:

> The court properly denied defendant's suppression motion.  Other participants in the crime made inculpatory statements that also inculpated defendant and provided the investigating detectives with probable cause for his arrest. In particular, one of the perpetrators made a videotaped statement that specified defendant's role in the crime, and the record establishes that this statement was part of the evidence before the suppression court.  Although the

detectives who arrested defendant did not testify, the only reasonable inference that can be drawn from the evidence is that these detectives, who were working on the same investigation, acted on the basis of a communication from the detective who had interviewed the other perpetrators [citing three New York cases, including] *People v. Mims*, 88 N.Y.2d 99, 113-14, 643 N.Y.S.2d 502, [510-11 (1996)].

*People v. Walker*, 25 A.D.3d 504, 808 N.Y.S.2d 223 (1st Dept. 2003).

The Appellate Division's decision was not "contrary to, or ... an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." See 28 U.S.C. §2254(d)(1). Moreover, it was not "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." See 28 U.S.C. §2254(d)(2). Accordingly, our Court cannot grant habeas on Ground One. In addition, Circuit Judge Raggi, sitting by designation in the Eastern District, has written:

The issue for this court ... is not whether it agrees or disagrees with the state court's ruling that [a habeas petitioner]'s arrest was adequately supported by probable cause. Before this court can reach this Fourth Amendment claim, [a habeas petitioner] must first show that New York did not provide an opportunity for full and fair litigation of the issue. In fact, [a habeas petitioner in New York] cannot satisfy this burden since New York Criminal Procedure Law § 710.20, governing motions to suppress unlawfully acquired evidence, clearly provided him with the requisite opportunity to litigate the lawfulness of his arrest. That procedure has been approved as facially adequate by federal courts in this Circuit. *See Capellan v. Riley*, 975 F.2d at 70 & n.1 [(2d Cir. 1992)] (and cases cited therein).

Neither can [this habeas petitioner] show any "unconscionable breakdown" in this otherwise adequate process. *See id.* (discussing what constitutes an "unconscionable breakdown"). To the contrary, [this habeas petitioner] was afforded a full evidentiary hearing on his arrest challenge, as well as one appeal of right and one opportunity to move for leave for appeal.

Under these circumstances, *Stone v. Powell*
[428 U.S. 465, 481-82 (1976)] prohibits habeas
review of [this petitioner]'s Fourth Amendment claim.

*Manning v. Strack*, 2002 WL 31780175, *4-5 (E.D.N.Y. Oct. 11,
2002).

**Ground Two**:  The claim that Walker's right to be
confronted with the witnesses against him was violated
when the judge permitted Detective Giorgio to testify
that Williams implicated Walker in the crime.

At pages 6-7 of today's Report, I noted that the jury heard
and saw Walker's written statement and videotaped statement while
Detective Davis was on the stand.  The prosecution then called
its last witness, Detective Giorgio, who testified at Tr. 411-48.
At Tr. 418, ADA Kerry O'Connell elicited the following:

Q.  Let's go back to your conversation with
Mr. Walker in the interview room.  Tell us what
you said to him and what he said to you?

A.  After telling him who I was, I told him
that there was a tape of a person implicating him
in this crime.

MR. SEARS: Objection.  Move to strike.

THE COURT: I'll allow it.  Go ahead.

A.  And at that time shortly thereafter,
myself with Detective[s] Davis and Moro and the
defendant went into a - - what I refer to as the
coffee room in the 34th Squad and played the tape
for Mr. Walker.

Q.  And that would be the videotape of
Rahman Williams?

A.  Rahman Williams' statement, yes.

If Williams had been on trial with Walker, Walker's
objection would have raised a rather clear Confrontation Clause
claim under *Cruz v. New York*, 481 U.S. 186 (1987), even if the
prosecutor were not offering the evidence against Walker.  Here,
Walker was the only person on trial, and hence the claim was even
clearer.  In *Bruton v. United States*, 391 U.S. 123, 128 n.3
(1968), the Supreme Court wrote:  "We emphasize that the hearsay

-11-

statement inculpating petitioner was clearly inadmissible against
him under traditional rules of evidence." Even before *Cruz*, the
New York courts did not allow an interlocking confession to be
considered against anyone except the declarant. *People v.
McNeil*, 24 N.Y.2d 550, 552, 301 N.Y.S.2d 503, 504 (Ct.App. 1969).

On the other hand, the jury was never given any specifics
about the extent to which Williams had been "implicating" Walker
"in this crime." (Tr. 418.) "Implicating" could have meant
saying that Walker was in Apartment 9-G while the body was in the
process of being cut up, as Castro had testified at Tr. 139-40.
Or it could have meant saying that Walker had helped Williams and
Perez to load the body parts into trash bags that were found by
the police (see Tr. 96-101, 263-66). Or it could have meant
saying that Walker was actually present at the time of the
killing.

Walker's counsel also objected to three more mentions of
Williams's statement. The second mention occurred four pages
later in the direct examination of Detective Giorgio:

> Q. Did you respond to his accusation that
> you were manufacturing evidence against him?
>
> A. No [sic]. My response first with regard
> to the videotape I said, "that wasn't me on that
> tape naming you as a person involved in this."
>
> MR. SEARS: Objection. I move to strike.
>
> THE COURT: Overruled.
>
> Q. I said that was Mr. Williams. I said,
> "The person who identified you [Castro] is a person
> from the neighborhood, from the street that knew you
> who places you there, and again, the bottle of Vodka
> is the last piece of incriminating evidence which
> convinces you that you in fact took part in this
> case, in this crime."

(Tr. 422.) Castro had appeared before the jury and had been
cross-examined. Williams had not.

The third mention of Williams's statement was on redirect:

> Q. Are you clear whatever way it happened
> [that] Mr. Walker was apprised of what Mr. Williams
> had said on the video tape?

-12-

        MR. SEARS: Objection

        THE COURT: I will allow it[.]

    A.  Oh, yes.

(Tr. 443-44.)

    The fourth mention of Williams's statement occurred in ADA
O'Connell's summation:

        ... These detectives told him they had
    undeniable evidence of his participation in this
    case.  They showed him – –

        MR. SEARS: Objection.

        THE COURT: Overruled.

        MS. O'CONNELL: They showed him the
    videotape statement of Rahman Williams.  Jerry
    Giorgio told him that he knew what was going on
    in the apartment.  They even knew the brand name
    of the Vodka that was drank up there.

(Tr. 667.)

    Mr. Kirshbaum's brief to the Appellate Division (Exh. A at
pp. 45-47) argued that Detective Giorgio's testimony violated
*Bruton, Cruz,* and *Crawford v. Washington*, 541 U.S. 36 (2004),
which was decided after Walker's 2003 trial.  At page 49, he
argued:  "Giorgio could have easily discussed what occurred
during the interrogation without specifically stating that
Williams implicated him [Walker] in the statement.  Giorgio could
have mentioned that Williams made a statement and that it was
shown to appellant.  It was inappropriate and unconstitutional
for the detective to make specific reference to a portion of a
co-defendant's statement that implicated the defendant."

    The People's brief (Exh. B at pp. 53-55) responded:

        ... [D]efendant's general objection was
    entirely insufficient to alert the court to his
    present Confrontation Clause complaints.  Thus,
    they are unpreserved for this Court's review.
    *People v. Kello*, 96 N.Y.2d 740, 744 (2001);
    *People v. Rojas*, 15 A.D.3d 211 (1st Dept. 2005);
    *People v. Rivera*, 8 A.D.3d 53 (1st Dept. 2004).

                        -13-

Nor is there reason to review defendant's claims in the interest of justice because they are meritless.

*     *     *

... In *Crawford*, the Supreme Court specifically held that, if an out-of-court statement is admitted for "purposes other than establishing the truth of the matter asserted," its introduction does not violate the Confrontation Clause. *Crawford*, 541 U.S. at 59, n.9. That was the case here.

Giorgio's testimony was not admitted to establish the veracity of Williams' statement implicating defendant. In fact, no details of that statement were put before the jury. The only reason that Giorgio was permitted to testify that he told defendant that Williams had implicated him was to show why defendant changed his story from his first statement, in which he claimed that he was not even at the scene, to the second statement, in which he admitted being present and participating in the murder. ....

.... Evidence that Williams had implicated defendant was admitted solely to show the effect of that information on defendant's state of mind.

Defendant argues that the testimony had to have been admitted for its truth because no limiting instruction was given to the jury (Defendant's Brief: [p. 48]). However, the simple answer to defendant's claim is that no limiting instruction was given because defendant did not ask for one. Thus, he has no cause for complaint in that regard.

Finally, Giorgio's brief testimony about Williams's statement could not have had the prejudicial effect that defendant suggests. Defendant took the stand and gave an account that was entirely consistent with his second statement, except that, at trial, he denied punching Pollard and taking his keys from him. ....

The People repeat those arguments in our Court. In my view, none of the People's arguments is persuasive except the last argument (harmless error).

-14-

After Detective Giorgio completed his testimony at Tr. 448, the judge called a recess for "a few minutes."  At Tr. 449, defense counsel made it clear that Walker was going to testify. Walker took the stand at Tr. 454 and completed his direct testimony before the luncheon recess at Tr. 500.  I find it clear that Walker's decision to testify was not triggered by the mentions at Tr. 418, 422 and 444 that Williams had made a statement implicating Walker.  Instead, in view of the testimony of Castro and Detective Davis, and Walker's second signed statement and videotaped statement, there was no rational hope of avoiding a guilty verdict unless Walker took the stand and, at the very least, denied doing anything to cause Pollard's death.

At Tr. 478, Walker testified that he told Perez he was unwilling to participate in the plan to murder Pollard, and that Perez retorted:  "Well, I already told you about it [the plan]. ... How [do] I know that you're not going to go snitch on me, not going to tell the police? ... You know what happens to a snitch." At Tr. 482, Walker testified:  "My intention was to find a way to get out of it ... but I didn't see any other way out of it other than to just be present."  At Tr. 484, he testified that he did not hit Pollard and did not take Pollard's keys, that Williams took the keys and gave them to him.  He conceded that he used the keys and opened the door to Pollard's apartment, whereupon Perez and Williams dragged Pollard in and killed him.  Walker denied that he participated in the killing, although he was present.  At Tr. 490, he testified that he returned to the apartment the next day because "I didn't want Bernard or Rahman thinking I was up to something, that I was trying to get away from them or notify the police."  Walker contested only two details in his videotaped statement; see Tr. 581 on cross-examination:

> Q.  You want them [the jury] to credit it?
>
> A.  Not the part about me hitting him or taking his keys.
>
> Q.  But everything else?  Every other little detail on there is true; right?
>
> A.  Pretty much.

Even if the jury believed Walker's trial testimony in its entirety, it amounted to an uncoerced confession to burglary, robbery, and (at least) felony murder.  See prosecutor's summation at Tr. 644-47, quoting Walker's testimony from Tr. 544-46.  Compared with Walker's own testimony implicating himself, the jury could not have attached much significance to the

testimony earlier that day in which Detective Giorgio mentioned that Williams had made a statement "implicating [Walker] in this crime" in some unspecified way.  In my view, even if we were to assume that the testimony at Tr. 418, 422 and 444 amounted to a constitutional error, it was harmless beyond a reasonable doubt. That is the standard on a direct appeal; in a habeas proceeding, the standard for harmless error is easier for a prosecutor to meet: the Supreme Court has ruled that a habeas petition should not be granted unless the violation of constitutional rights had "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks and citation omitted).

The three cases cited to the Appellate Division for lack of preservation were pre-*Crawford* trials involving (1) "excited utterances" made by phone callers immediately after witnessing a crime (*Kello* and *Rivera*) and (2) plea allocutions by persons who had purchased drugs from the defendant (*Rojas*).  In those situations, prior to *Crawford*, a judge would be far less alert to the applicability of the Confrontation Clause than in Walker's situation, where the absent Williams had given the detectives a statement implicating Walker.  Kello's trial attorney "never based his trial objection to the 911 tapes on the Confrontation Clause [but only on] our State common-law hearsay rule."  *People v. Kello*, 96 N.Y.2d 740, 743 (Ct.App. 2001).  On habeas, Judge Baer, ruling prior to *Crawford*, found no cause to excuse Kello's lack of a constitutional objection.  *Kello v. Walsh*, 2003 WL 21488015, *3-4 (S.D.N.Y. June 26, 2003).  By contrast, in *Rivera v. Ercole*, 2007 WL 1988147, *5 (S.D.N.Y. July 6, 2007), Judge Hellerstein found it "unnecessary to rule on whether [Rivera's] Confrontation Clause claim was preserved," even though that had been the Appellate Division's primary ruling.  Rivera's trial attorney had asked for "more time to ... determine if the [caller's] statements [to Margarita] qualified as 'truly an excited utterance.'" (*Id.* at *2.)  But he "did not object when Margarita was called, nor at any time during her testimony." (*Id.* at *3.)  Judge Hellerstein proceeded to the merits and found no *Crawford* violation, because the "statements were not made in response to any interrogation, or for purposes of a criminal prosecution." (*Id.* at *6.)

In the case at bar, the Appellate Division ruled as follows on the Confrontation Clause claim:

Defendant's remaining contentions, including his Confrontation Clause argument, are unpreserved and we decline to review them in the interest of justice.  Were we to review these claims, we would

-16-

reject them.

*People v. Walker*, 25 A.D.3d 504, 808 N.Y.S.2d 223 (1st Dept. 2003).

I recommend that Judge Berman avoid attempting to determine whether the objections at Tr. 418, 422, 444 and 667 were insufficient to alert the trial court to the Confrontation Clause and, if so, whether any such insufficiency can be excused by a showing of cause and prejudice. (I note that Walker has claimed that his trial counsel provided ineffective assistance. See page 2 of today's Report, quoting Walker's July 2, 2007 letter to me.)

I recommend that Judge Berman rule that Ground Two fails on the merits because, even if we were to assume that the Confrontation Clause was violated, any such error was harmless.

## CONCLUSION AND RECOMMENDATION

For the reasons set forth above, I recommend that Judge Berman deny Jason Walker's habeas petition. Ground One fails because Walker received a full and fair hearing on his claim that the arresting detectives lacked probable cause, and the state courts made a reasonable determination that those detectives had probable cause. Ground Two fails because, even if we were to assume that the Confrontation Clause was violated, any such error was harmless.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, any party may object to this recommendation within 10 business days after being served with a copy (i.e., **no later than December 17, 2008**), by mailing written objections to the Pro Se Clerk of the U.S. District Court and mailing copies (a) to the opposing party, (b) to the Honorable Richard M. Berman, U.S.D.J., at Room 650, 500 Pearl Street, New York, NY 10007 and (c) to me at Room 1360, 500 Pearl Street, New York, NY 10007. Failure to file objections within 10 business days will preclude appellate review. *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. Rules 72, 6(a), and 6(d). Any request for an extension of time must be addressed to Judge Berman.

*Douglas F. Eaton*

DOUGLAS F. EATON
United States Magistrate Judge

-17-

U.S. Courthouse, Room 1360
500 Pearl Street
New York, NY 10007

Dated:    New York, New York
          November 26, 2008

Copies of this Report and Recommendation are being mailed to:

Jason Walker, DIN # 03A1117
Southport Correctional Facility
P.O. Box 2000
236 Bob Masia Drive
Pine City, NY 14871-2000

Nicole Beder, Esq.
Appeals Bureau
District Attorney's Office
One Hogan Place
New York, NY 10013

Hon. Richard M. Berman